UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

PAUL MASON,                          )
     *Plaintiff*,                     )
                                    )
  *vs*.                                )     1:08-cv-01388-JMS-LJM
                                    )
MICHAEL J. ASTRUE,                   )
Commissioner of the Social           )
Security Administration,             )
     *Defendant*.                     )

## ENTRY REVIEWING THE COMMISSIONER'S DECISION

Pursuant to 42 U.S.C. § 405(g), Paul Mason asks the Court to review the Social Security Administration's denial of his application for disability insurance benefits ("DIB").[1]  Acting for the Commissioner of the Social Security Administration ("Commissioner"), an Administrative Law Judge ("ALJ") denied Mr. Mason's claims.  After reviewing the record, the Court affirms the Commissioner's decision.

## I.
## Overview of the Administrative Record

     Paul Mason, born June 28, 1963, applied for DIB on February 9, 2006.  (R. 44, 94.)  He claims he has been disabled since January 20, 2005 due to back and leg pain associated with lumbar strain.  (R. 88.)  The claim was denied on October 30, 2006 as well as upon reconsideration on September 1, 2006.  (R. 24.)  A hearing was subsequently held on March 10, 2008 before an ALJ.  (R. 395-436.)  After hearing testimony from Mr. Mason, who appeared

---

[1] Upon the written consent of the parties, this case has been referred to the magistrate judge for all proceedings, including for the entry of judgment, as permitted under 28 U.S.C. § 636(c) and Fed. R. Civ. Pro. 73.  (Dkt. 11.)

with counsel, from medical expert Dr. Richard Hutson, and from vocational expert Robert Barker, the ALJ issued a decision on December 11, 2007 finding Mr. Mason was not entitled to DIB. (R. 24-41.) In the decision, the ALJ concluded that Mr. Mason was not disabled as defined by the Social Security Act ("the Act") because he remained capable of performing his past relevant work as a light unskilled hand packer and of performing jobs that exist in significant numbers in the national economy. (R. 39-40.) The Appeals Council denied review (R. 5-7), and Mr. Mason filed this action.

### A. Medical Evidence[2]

Mr. Mason injured his back while working in January 2005 when he slipped on some ice after stepping off a ladder. (R. 231, 238.) The pain was "not too bad," so he finished the day of work. (R. 231.) When the pain did not subside within a few days, however, he sought treatment. (R. 231.)

Mr. Mason first saw Dr. David Wells on January 24, 2005, three days after the accident. (R. 231.) Dr. Wells completed an "Ability to Work Report," stating Mr. Mason was able to accomplish intermittent sitting work; must avoid bending, squatting, or twisting; and could push, pull, or lift up to five pounds frequently. (R. 233.) Dr. Wells completed a second report a week later with an identical prognosis. (R. 236.) Mr. Mason had a minimal range of motion and

---

[2] The absence of a factual summary in the claimant's brief needlessly impeded the Court's review of this matter. Nor did claimant's brief specify which of the five steps under 20 C.F.R. § 404.1520 was at issue, though claimant was directed to do so in the briefing schedule. (Dkt. No. 14.) For the future, claimant's counsel is reminded of his responsibility to develop an accurate, thorough summary of the evidence, particularly with respect to issues on which a claimant bears the burden of proof. The failure to do so may result in, among other things, reduction or elimination of attorney's fees otherwise available under the Equal Access to Justice Act. *See* 28 U.S.C. § 2412(d)(1)(C).

reported sharp pain in the lower back and some pain radiation into both thighs.  (R. 237.)  Dr. Wells referred him for physical therapy and prescribed pain medication.  (R. 237.)

Dr. Buschbacher evaluated Mr. Mason on February 8, 2005 and recorded low back pain radiating to the left pelvic area.  On examination, Mr. Mason's gait was antalgic, but he was able to toe and heel walk.  (R. 238.)  There was no acute distress when at rest, but Mr. Mason's movement was "markedly limited" due to significant muscle guarding and "obvious discomfort." (R. 238.)  The low lumbar area was tender to the touch, reflexes were symmetric, sensation was decreased in the left foot, and a straight-leg-test on the left was positive.[3]  (R. 238.)   Dr. Buschbacher ordered an x-ray of the lumbosacral spine, which revealed "mild L4-5 degenerative disc disease."[4]  (R. 258.)  A February 25, 2005 MRI showed anatomic alignment.  (R. 183.) Nerve conduction studies at the time were consistent with left low lumbar radiculopathy,[5] "although it is a bit difficult to tell."  (R. 242.)

Dr. Buschbacher continued to see Mr. Mason every two to three weeks through May 2005.  He was difficult to examine because of tenderness in the lumbar region, though Dr.

---

[3] ALJ Andrew Tranovich provided a useful and informative explanation of the straight leg test in his opinion.  (R. 31-32.)  The test evaluates a patient's subjective complaints by raising the patient's leg from two different positions.  First, the patient lies on his or her back, and the leg is raised until pain in the low back is registered.  From this position, pain is caused by stretching and impingement of the nerves running from the low back into the leg.  In the second position, the leg raise is performed while the patient is sitting.  Non-duplication of the subjective pain in this position is indicative of nonorganic pain or symptom magnification.

[4] "Degenerative disc disease (DDD) is not really a disease but a term used to describe the normal changes of the discs in the spine as a person ages."  Shannon Erstad, WebMD, Degenerative Disc Disease, http://www.webmd.com/hw-popup/degenerative-disc-disease (last accessed February 22, 2010).

[5] "Radiculopathy is a condition due to a compressed nerve in the spine that can cause pain, numbness, tingling, or weakness along the course of the nerve."  Jason C. Eck, MedicineNet.com, Radiculopathy, http://www.medicinenet.com/radiculopathy/article.htm (last visited Oct. 28, 2009).

Buschbacher was able to note the muscle mass in Mr. Mason's left calf had decreased.  (R. 241.)
Pain continued to radiate into Mr. Mason's left leg, and straight-leg raises remained positive.  (R.
245.)   Dr. Buschbacher suspected radiculopathy, though the "MRI is not particularly
remarkable."   (R. 245.)   He suggested starting Mr. Mason on a series of epidural steroid
injections as well as sleep medications.  (R. 245, 247.)

After the injections, Mr. Mason experienced a few days of relief, but the symptoms
remained.  (R. 251, 253.)  Mr. Mason was also participating in physical therapy.  (R. 249.)  On
April 5, 2005, Mr. Mason reported to his physical therapist that he had good and bad days and
could sometimes clean the house.  (R. 285.)  The therapists reported many of the same symptoms
Dr. Buschbacher recorded (sensitivity to palpitation, guarded movements).  (R. 285-90.)  After
the symptoms did not improve and useful evaluation continued to be difficult, indeed "largely
invalid" (R. 253) -- straight-leg-raises were invalid bilaterally (R. 251) -- Dr. Buschbacher
recommended discharge with permanent work restrictions after completion of a Functional
Capacity Evaluation.  (R. 253.)

Mr. Mason had physical therapy every day for two weeks before the Functional Capacity
Evaluation (R. 291).  The therapy seemed to help as his tolerance improved: he reported the pain
as a three out of ten; he could use a treadmill with some limping; and he could tolerate squatting,
kneeling, and climbing a ladder.  (R. 296-300.)

The Functional Capacity Evaluation was held on May 26, 2005 and revealed a capacity
for light work in an eight-hour work day.  (R. 261.)  It was noted that after the third task, Mr.
Mason exhibited aggravated symptoms, which progressed to numbness in the left leg and
cramping in the hamstring muscles.  (R. 264.)  While Mr. Mason was able to complete the test,

these symptoms persisted and caused "severe deviations" during all position tolerance and mobility tasks.  (R. 264.)  Indeed, Mr. Mason's endurance decreased by 23 percent towards the end of the test, and "based on these observations, it is questionable whether the patient would be able to consistently work an eight-hour day and maintain a safe level of performance."  (R. 264.)  Consequently, the evaluator noted Mr. Mason's previous job may not be suitable without modifications.  (R. 264-65.)

Dr. Buschbacher saw Mr. Mason a few days after the evaluation on June 1, 2005, which was enough time for Mr. Mason to return to normal.  (R. 255.)  Dr. Buschbacher noted the evaluation revealed five percent impairment to the whole person, which was in the normal limits.  (R. 255, 61.)  He believed Mr. Mason had reached the maximum level of improvement and recommended discharge. (R. 255-56.)  Accordingly, he released Mr. Mason to return to work, restricted to light duty.

On September 21, 2005, Dr. Majid performed a consultative disability examination.  (R. 214-16.)  He diagnosed lumbar disc disease, though found no tenderness and stated the "claimant does not appear to be in distress."  (R. 214-15.)  Both passive and active motion ranges were normal, but Mr. Mason declined to walk toe to heel or to squat.  (R. 215.)  Mr. Mason's power was a five out of five, and there was no objective evidence of nerve root or spinal cord involvement.  (R. 216.)  For Dr. Majid, Mr. Mason should have the opportunity to stand and walk intermittently for about four hours in an eight-hour day, and his lifting, carrying, and handling capacities should be limited to ten to twenty pounds.  (R. 216.)

Reviewing Mr. Mason's medical record to this point on October 6, 2005, Dr. Bastnagel, a state agency physician, reported Mr. Mason could perform medium exertional work, including

lifting 50 pounds occasionally and lifting 25 pounds frequently.  He believed Mr. Mason could stand or walk with normal breaks for six hours of an eight-hour workday.  (R. 207.)  Dr. Bastnagel also found Mr. Mason's allegations and contentions regarding his symptoms and functional limitations "fully credible because they are reasonably well supported by appropriate medical findings and are not inconsistent with the overall evidence in file."  (R. 211.)

With that assessment, Mr. Mason saw Dr. Dietz in November 2005 for a surgical evaluation.  (R. 135-38.)  Mr. Mason reported walking and standing exacerbated his symptoms though medication, rest, and the hot tub help ease the pain.  (R. 135.)  When the pain is at its worst, Mr. Morison rated it as a seven out of ten.  (R. 136.)  After conducting a physical examination and reviewing Mr. Mason's x-ray and MRI, Dr. Dietz found symptoms consistent with degenerative disc disease and a herniated disc but no myelopathy.[6]  (R. 138.)  Mr. Mason appeared in pain and anxious, though after hearing surgery offered less than a 50 percent chance of success, Mr. Mason declined the option.  (*Id*.)

Mr. Mason next visited Dr. Niederwanger, in April 2006.  There, he reported the pain could rise to a nine out of ten when active.  (R. 141.)  Straight leg raises were positive with some radiation, though Dr. Niederwanger believed some of the Mr. Mason's weakness was subjective.  (R. 142.)  No assistive device was needed to walk.  (R. 171.)  Dr. Niederwanger suggested steroid and sacroiliac joint injections.  (R. 172.)  As before, the injections provided pain relief for a few days after which symptoms returned.  (R. 177.)  In the end, Dr. Niederwanger believed Mr.

---

[6] "Myelopathy is a term that means that there is something wrong with the spinal cord itself." Myelopathy, Necksurgery.com, *available at* http://www.necksurgery.com/causes-mechanical-myelopathy.html (last accessed February 22, 2010).

Mason required a more multi-disciplinary approach including physical therapy, occupational therapy, and psychological evaluations.  (R. 178.)

Dr. Fife, a state agency physician, conducted a second Residual Functional Capacity Assessment in July 2006, determining Mr. Mason could perform light exertional work with occasional postural movements, and avoiding climbing, extreme temperatures, wetness, vibrations, and hazards.  (R. 149-56.)  Dr. Fife estimated Mr. Mason could lift twenty pounds occasionally and ten pounds frequently; and could stand or walk for six hours of an eight hour day.  (R. 150.)

During this time, Mr. Mason was also seeing Dr. Stine, a family practitioner.  Mr. Mason has been in Dr. Stine's care since May 2005 when Dr. Stine ordered an MRI (R. 121, 271), but there is a gap in documents from Dr. Stine until a letter to the Disability Reviewer dated August 6, 2006.  (R. 157.)  In the letter, Dr. Stine stated, "I agree that Mr. Mason is unable to work. He is unable to lift, walk for any distance, or ride in a car without an increase in his baseline pain." (R. 157.)

On August 10, 2006, Dr. Stine completed a multiple impairment questionnaire for Mr. Mason, stating his prognosis was "fair to poor."  (R. 108.)  Dr. Stine reported Mr. Mason could sit up to one hour and stand or walk up to one hour, must move every fifteen to twenty minutes, could lift up to ten pounds occasionally, and could occasionally carry up to five pounds.  (R. 110-11.)  Mr. Mason had tried an array of pain medication (R. 112, 118-19, 168) but was in constant pain (R. 113).

Mr. Mason next visited Dr. Stine on September 27, 2006.  Dr. Stine observed that Mr. Mason walked with a cane and an antalgic gait.  (R. 100.)  Mr. Mason reported stumbling at

times but no falls.  (R. 100.)   Curiously, Dr. Stine observed that Mr. Mason was "anxious, depressed mood, irritable" but, later in the report, "not anxious . . . no agitation."  (R. 100.) Again after a visit on December 14, 2006, Dr. Stine stated Mr. Mason was anxious, and later in the report, that he was not anxious.  (R. 104.)  At each visit, however, Dr. Stine consistently reported tenderness, pain, and positive straight leg tests.  (R. 100, 158, 165.)

In 2007, Dr. Stine began to report worsening symptoms (R. 364, 367, 378) and increasing incidents of falling – several times per week (R. 373, 378).  The falls were due to numbness in Mr. Mason's leg.  At a September 28, 2007 visit with Dr. Stine, Mr. Mason requested a walker to help prevent falling.  (R. 387.)   In a November 2007 multiple impairment questionnaire, Dr. Stein reported that Mr. Mason was having "only bad" days.  (R. 385.)   And Mr. Mason's constant pain had led to depression and irritability, which in Dr. Stein's view resulted in psychological limitations on Mr. Mason's ability to work, including being limited to "low stress" work.  (R. 384-85.)

### B.  Work History

Mr. Mason has the equivalent of a high school education, obtained in 1981.  (R. 92.)  He has worked as a construction worker, roofer supervisor, roofer, hand packer, bullet punch press operator, box repairer, framer, house rebuilder, and siding technician (R. 74-77, 89, 427-30.)  His last job was with Satco, Inc., working as a box repairer (R. 77, 429), and he had been off work since the initial injury.  (R. 238.)

### C.  Hearing Testimony

The ALJ held a hearing on March 10, 2008.  Mr. Mason appeared with his attorney, and the ALJ heard testimony from Mr. Mason, medical expert Dr. Richard Hutson, and vocational expert Robert Barker.

### 1.  Mr. Mason's Testimony

Mr. Mason described his past employment, including his most recent job as a box repairer where he regularly lifted up to 90 pounds.  (R. 399.)  He also recounted his medical history:  two lumbar MRIs in 2005 (R. 401), steroid injections (R. 404), and other medications including Oxycontin, Percocet, Clozopan, Somas, Lexapro, and Zyprexa (R. 404).  In addition to pain medication, he has been taking medication for depression.  (R. 412.)  Dr. Stine also prescribed Mr. Mason a cane about two years ago to guard against falling.  (R. 405.)  In 2007, he fell about a dozen times, usually while walking his kids to the park.  (R. 405-06.)  The cane helps, but he still falls, and Dr. Stine has prescribed a walker, though Mr. Mason does not have it yet.  (R. 405.)

The falls are the result of numbness in his left leg.  There is no pain in his left leg but tingling, as if it was asleep.  (R. 403.)  He has good days and bad days, and about 50 percent are mediocre or bad days.  (R. 407.)  On most days, he lies down with his feet up, but on the good days, which occur about twice each week, he is able to do laundry.  (R. 407.)  Mr. Mason stated on the mediocre days he is able to do the dishes "if I feel like standing."  (R. 408.)  On bad days, he stays in bed.  (R. 407.)  He cannot drive because he does not have a license, but he believes he would not able to drive anyway "because my feet don't work right."  (R. 409.)

Mr. Mason testified that he wakes up in pain every night and takes muscle relaxers to go back to sleep.  (R. 409.)  He stated he could sit in a chair for one hour, could stand for twenty minutes (though he has not tried to stand longer than that), can walk 150 yards (the distance to the park), and can lift ten pounds (which he does numerous times throughout the day).  (R. 409-10.)

### 2.  Medical Expert's Testimony

Dr. Richard Hutson testified that all Mr. Mason's MRIs showed degenerative disc disorder and that most showed no herniation but annular tears at L4-5 and L5-S1.  (R. 414.)  Dr. Hutson then summarized the conclusions and observations made by Dr. Dietz, Dr. Niederwanger, Dr. Majid, and Dr. Stine, who Dr. Hutson referred to as Mr. Mason's primary care physician.  (R. 414-15.)  Dr. Hutson pointed out that Dr. Stine had come to different neurological findings than the other specialists, specifically pointing to Dr. Stine's finding of zero reflexes in the ankles.  (R. 415.)  "[H]e's the only one that found them at that level to my knowledge."  (R. 415.)  Neither did the other physicians find significant increase in symptoms. (R. 416, 424.)  Dr. Niederwanger did notice some decreased sensation in the left leg (R. 416.), but Dr. Stine was the only one to described absolute numbness.  (R. 416.)  Dr. Hutson concluded, then, that while Mr. Mason had degenerative disc disease, he did "not have the appropriate loss of neurological function consistent in this record to either meet or equal the listing which would be 1.04."  (R. 416.)

Dr. Hutson continued that based on the medical evidence, Mr. Mason could do light work "by definition" – lifting twenty pounds occasionally and ten pounds frequently (R. 417.)   Dr. Hutson also agreed that Mr. Mason needed a walker if he was indeed falling because of the pain,

and he would need a sit / stand option for five minutes of every hour.  (R. 419.)  Dr. Hutson

disagreed with Dr. Stine's letter of August 10, 2006, saying it did not contain any objective

findings.  (R. 421.)

### 3.  Vocational Expert's Testimony

After Dr. Hutson's testimony, Mr. Robert Barber testified as a vocational expert.  He

described the job titles, skill level, and exertional level of Mr. Mason's past jobs, which ranged

from light unskilled to heavy skilled.  (R. 427-30.)  When asked to evaluate a hypothetical

individual in Mr. Mason's condition, Mr. Barber testified such an individual could not do any of

the other previous jobs except a hand packer.  (R. 431-32.)  Such an individual could also

perform other unskilled, sedentary jobs such as an information clerk.  (R. 433.)  If the individual

had all the limitations listed by Dr. Stine, on the other hand, that individual could not do any of

the work because he would have to miss too much work.  (R. 435.)

## II.
## Applicable Standards

To qualify for disability benefits, a claimant must be disabled as defined by the Social

Security Act—that is, unable to engage in substantial gainful activity due to a medically

determinable impairment that can be expected to either cause death or continue for at least

twelve continuous months. 42 U.S.C. §§ 416(i), 423(d), 1382c(a).  The physical or mental

impairment must also be so severe that Mr. Mason is unable to do his previous work.  42 U.S.C.

§ 423(d)(2)(A).  The impairment must keep him from participating in other substantial gainful

work in the national economy, which his age, education, and work experience should allow him

to do.  *Id.*  Mr. Mason will not be found disabled as long as he is physically and mentally able of

substantial gainful work in the national economy;  it is irrelevant whether the work is available in the immediate area, or even if Mr. Mason would be hired if he applied.  *Id.*

To determine whether a claimant is disabled, the ALJ must apply the following five-step inquiry:

(1)    Has the claimant engaged in substantial gainful activity?  If so, he was not disabled.

(2)    If not, did he have an impairment or combination of impairments that are severe? If not, he was not disabled.

(3)    If so, did the impairment(s) meet or equal a listed impairment in the appendix to the rules?  If so, he was disabled.

(4)    If not, does he have enough residual functional capacity ("RFC")[7] to perform his past relevant work?  If so, he was not disabled.

(5)    If not, could he perform other work given his RFC, age, education, and experience?  If so, then he was not disabled.  If not, he was disabled.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520.  This inquiry places the burden of proof on the claimant in steps one to four, and the Commissioner holds this burden in step five.  *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

The Court's review of the ALJ's decision is deferential and thus limited; it must affirm the decision so long as (1) the decision does not reflect a legal error and (2) substantial evidence supports the factual findings.  *Dixon*, 270 F.3d at 1176 (citing *Schoenfield v. Apfel*, 237 F.3d 788 (7th Cir. 2001)).  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*  However, the Court may not re-weigh the evidence or substitute its judgment for that of the ALJ.  *Binion v. Chater*, 108 F.3d 780, 782

---

[7] RFC is defined as "the most you can still do despite your limitations."  20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1).

(7th Cir. 1997).  Even if "in light of all the evidence, reasonable minds could differ concerning whether [Mr. Mason] is disabled, we must affirm the ALJ's decision denying benefits."  *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).  Nevertheless, the ALJ must articulate the analysis used to reach his decision.  While he "is not required to address every piece of evidence or testimony," he must "provide some glimpse into [his] reasoning . . . [and] build an accurate and logical bridge from the evidence to [his] conclusion."  *Dixon*, 270 F.3d at 1176.

If the Court finds substantial evidence supports the ALJ's decision, it must be affirmed.  *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).  Otherwise, the Court has two alternatives: reverse or remand.  "[A] remand for further proceedings is the appropriate remedy unless the evidence before the court compels an award of benefits.  An award of benefits is appropriate only where all factual issues have been resolved and the record can yield but one supportable conclusion."  *Id.* at 355 (quotation and citation omitted).

## III.
## The ALJ's Decision

Using the required five steps, the ALJ found that Mr. Mason was not disabled.  In step one, he found Mr. Mason had not engaged in any substantial gainful activity since January 20, 2005, the date Mr. Mason claims his disability began.  (R. 26.)  Next, the ALJ found Mr. Mason suffers from degenerative disc disease of the lumbar spine, which qualifies as a severe impairment.  (R. 26.)  However, in step three, the ALJ found the impairment does not meet or equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 26.)  Moving to step four, the ALJ found Mr. Mason is able to perform his past relevant work as a light unskilled packer.  (R. 39.)  While this finding alone denotes no disability, the ALJ continued to step five and found that Mr. Mason has RFC to perform light work as defined in the

regulations.  (R. 26.)  Additionally, Mr. Mason retained skills from past relevant work that are transferable to other work Mr. Mason is able to perform, particularly as light semi-skilled general hardware salesperson.   (R. 40.)   Finally, considering Mr. Mason's age, education, work experience, and residual functional capacity, the ALJ found he met the requirements of such occupations as an information clerk, sedentary unskilled pari-mutuel ticket checker, sedentary unskilled assembler, and sedentary unskilled telephone quotation clerk.  (R. 40.)

**IV.**
**Discussion**

Mr. Mason challenges the ALJ's decision at Step Three and at the RFC determination that the ALJ used at Steps Four and Five.

### A.  Step Three:  The ALJ's Consideration of Listed Impairments

Under the theory of presumptive disability, a claimant is deemed disabled if he has an impairment with symptoms that meet those set forth in the Listing of Impairments.  20 C.F.R. § 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1.  Alternatively, if the claimant's symptoms do not exactly meet the symptoms specified for a Listed Impairment, the claimant will still be deemed disabled if medical evidence establishes that his symptoms are  equal in severity and duration to those of a Listed Impairment.  *Id.* § 404.1526(a), (b).  In that latter circumstance, the claimant is said to have "equaled" the Listed Impairment.  *Id.* § 404.1526(a).

Mr. Mason claims that the ALJ committed three errors at Step Three:  improperly analyzing Listed Impairment 1.04 (disorders of the spine), failing to analyze Listed Impairment 12.04 (for affective disorders, including depression), and failing to specify the burden of proof that the ALJ applied.

14

### 1.  The ALJ's Treatment of Listed Impairment 1.04

Mr. Mason first argues that substantial evidence does not support the ALJ's finding that Mr. Mason's condition does not equal Listed Impairment 1.04; indeed, he asserts that "[n]early every piece of medical evidence" establishes equivalence.[8]   But because Mr. Mason simply asserts his conclusion about the evidence—rather than developing a cogent argument explaining why the string-cited evidence supports his conclusion—the Court need not consider his assertion. *See Lachman v. Ill. State Bd. of Ed.*, 852 F.2d 290, 291 n.1 (7th Cir. 1988) (finding waiver where party made developed no "substantive argument").   Even if the Court did consider it, however, Mr. Mason still could not prevail on this point.   As Mr. Mason concedes, determining equivalence "is a strictly medical determination," (Dkt. 20 at 8), and many medical opinions support the Commissioner's conclusion, including those of the three state reviewing physicians who signed Disability Determination and Transmission forms, *see Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (explaining that signatures on such forms indicate a finding of a lack of medical equivalence) and the hearing testimony of Dr. Hutson (R. 416 (testifying that Mr. Mason "does not have the appropriate loss of neurological function…to either meet or equal the listing which would be 1.04").   *See also Glenn v. Secretary of Health & Human Services*, 814 F.2d 387, 391 (7th Cir. 1987) (noting that given the deferential standard of review, "courts will rarely be able to say that the administrative law judge's finding was not supported by substantial evidence").   Thus, either way, the Court rejects any claim of error about the substance of the ALJ's finding regarding Listed Impairment 1.04.

---

[8] Mr.  Mason does not argue that he actually meets the requirements of Listed Impairment 1.04.

Mr. Mason alternatively argues that no matter the substance of the ALJ's decision on this point, the form is wrong. ALJs must discuss evidence that both supports their conclusion and evidence that undercuts it; they may not cherry pick. *See, e.g.*, *Golembiewski v. Barnhart*, 322 F.3d 912, 917-18 (7th Cir. 2003). Yet, he says, the ALJ did just that here by discussing only part of the report from Dr. Dietz (the examining orthopedic surgeon), while omitting the rest that he says is favorable to him.

Again, however, the Court finds no error. Mr. Mason makes no claim that the ALJ inaccurately reported Dr. Dietz' findings that were inconsistent with equivalence to Listed Impairment 1.04. Any failure to discuss the other portions of Dr. Dietz' findings is, at best, harmless error. As Mr. Mason argued, in the context of his unsuccessful substantial evidence argument, the ALJ "extensively summarize[d]" evidence establishing Mr. Mason's equivalence to Listed Impairment 1.04, (Dkt. 20 at 9), significantly inconsistent with an allegation of cherry picking. And any error almost rises to the level of an invited one too. If Dr. Dietz' other findings were so obviously and completely contradictory to Dr. Hutson's hearing testimony, which the ALJ accepted, one would have expected Mr. Mason's counsel to have cross-examined Dr. Hutson about them at the hearing, which counsel did not do. *Cf. Potts v. Astrue*, 2009 U.S. Dist. LEXIS 52769, *8 (N.D. Ind. 2009) ("When an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making his strongest case for benefits. Thus, the ALJ has a duty to fully and fairly develop the record, but should not be forced to function as counsel for the claimant." (quotation and citations omitted)).

Accordingly, the Court finds no error with respect to Listed Impairment 1.04.

## 2.   The ALJ's (Lack of) Treatment of Listed Impairment 12.04

Mr. Mason also claims that the ALJ erred at Step Three by failing to make any mention of Listed Impairment 12.04 in the written opinion.  On this point, the Court agrees with Mr. Mason.

Ordinarily, an ALJ must specifically mention, and then discuss, each potentially applicable Listed Impairment.  *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) ("[T]his court has also held that an ALJ should mention the specific listings he is considering and his failure to do so, if combined with a 'perfunctory analysis,' may require a remand."  (citations omitted)).  Although the Commissioner here seeks to rely upon the state reviewing physicians' signatures on disability determination transmittal to make the ALJ's failure to specifically mention Listed Impairment 12.04 harmless error, the Seventh Circuit deems such forms insufficient when "there is…contradictory evidence in the record" about whether the Listed Impairment may apply.  *Id.*  at 584.  And there is enough contradictory evidence here to at least have required the ALJ to discuss whether the Listed Impairment applies.  Mr. Mason's brief cites to a string of medical records indicating that Dr. Stine treated him for depression.  (Dkt. 20 at 12.)  Indeed, Mr. Mason even provided the ALJ with a report from Dr. Stine opining that Mr. Mason is "chronically depressed" and thus has "psychological limitations" that affect his ability to work.  (R. 384-85.)

The ALJ's failure to consider Mr. Mason's potential depression is not entirely surprising.  The record indicates that, up until close to the time of the hearing, Mr. Mason was essentially alleging back problems.  (*E.g.*, R. 88.)  Yet, at the hearing, Mr. Mason specifically advised the

CASE HEADER

ALJ that he believes that he suffers from depression.  (R. 412.)  Given that at least some evidence in the record supports that claim, the ALJ was obliged to consider it.

What is surprising, however, is that the Appeals Council did not correct the ALJ's oversight.  Despite the somewhat oblique way that the claims of depression found their way to the ALJ, Mr. Mason clearly and specifically presented those claims during the administrative appeals process.  (R. 12 (arguing that the ALJ erred by not considering whether Mr. Mason suffered from any mental impairments, and citing specific evidence that Mr. Mason claims would support such a finding).)

Because the Court lacks the authority (or the medical expertise) to determine, in the first instance, whether Mr. Mason's depression either meets or equals Listed Impairment 12.04, *see* 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2), the Court must remand this matter back to the SSA for further proceedings.[9]

### 3.  The Omission of any Mention of the Applicable Burden of Proof

The final error that Mr. Mason claims that the ALJ's opinion should have explicitly specified that it applied a preponderance-of-the-evidence standard, rather than a standard of proof beyond a reasonable doubt.  Because Mr. Mason has found no authority requiring the ALJ to specifically articulate the evidentiary standard and, in any event, because nothing in the ALJ's decision suggests that the ALJ actually required Mr. Mason to establish his disability beyond a reasonable doubt, the Court overrules this assertion of error.

---

[9] The Court notes that, given his lackluster arguments that he actually equals Listed Impairment 12.04 here—indeed, his brief does not even quote its requirements in his brief—Mr. Mason may have difficulties convincing the ALJ of his medical equivalence to it.  But before the Court can review whether the ALJ erred in his findings about Mr. Mason's depression, the ALJ must first make a finding, which never happened here.

### B.  The ALJ's Determination of Mr. Mason's RFC for Steps Four and Five

According to Mr. Mason, the ALJ's RFC determination was faulty in three ways:  The ALJ failed to consider his claims of depression, misjudged his credibility, and the ALJ failed to sufficiently describe the RFC findings.

### 1.  The ALJ's Silence About Mr. Mason's Claims of Depression

Because the ALJ's opinion makes only a passing reference to a single medical record indicating that Mr. Mason had no mental impairment and includes no discussion of Dr. Stein's records to the contrary on that score, Mr. Mason argues that the ALJ improperly failed to consider his claims of depression. That failure, he says, violates the ALJ's duty to consider all of his impairments when formulating the RFC, severe and nonsevere, and physical and mental. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) ("[W]hen determining the RFC, the ALJ must consider all medically determinable impairments, physical and mental, even those that are not considered 'severe.'" (citation omitted)).  In contrast, the Commissioner contends that the ALJ implicitly found that Mr. Mason suffers no mental impairment limiting his ability to work; therefore, the ALJ did not need to include any additional limitations in the RFC.

After reviewing the ALJ's opinion, the Court agrees with Mr. Mason that the ALJ simply appears to have overlooked Mr. Mason's claims of depression (for the reasons explained earlier). A remand is thus required for the ALJ to specify his findings about whether Mr. Mason suffers from depression and about the extent that the depression imposes limitations on Mr. Mason— including whether or not the ALJ agrees with Dr. Stein that Mr. Mason needs to be limited to "low stress" jobs (R. 384).  Absent those findings, the Court cannot conduct meaningful judicial review of the ALJ's decision. *See Williams v. Bowen*, 664 F. Supp. 1200, 1207 (N.D. Ill. 1987)

19

("No court should be forced to engage in speculation as to the reasons for an ALJ's decision. If the decision on its face does not adequately explain how a conclusion was reached, that alone is grounds for a remand." (citations omitted)).

### 2. The ALJ's Assessment of the Degree of Mr. Mason's Credibility

Next, Mr. Mason challenges the ALJ's finding that Mr. Mason's "credibility is highly suspect" regarding the true extent of his pain. (R. 38.) Although Mr. Mason contends that the ALJ erred by making that finding without sufficiently following SSR 96-7p, which sets forth the analytical framework that an ALJ must use to judge credibility, a detailed discussion of SSR 96-7p is not necessary here. The ALJ discounted Mr. Mason's testimony, in large part, because the ALJ determined that objective medical evidence did not correlate with the degree of pain that Mr. Mason claims to experience. But the ALJ failed to consider Mr. Mason's depression. In Dr. Stine's opinion, Mr. Mason's "chronic, unremitting pain" has led to depression. (R. 384.) If on remand the ALJ finds that Mr. Mason in fact suffers from depression, that depression may impact the ALJ's assessment of Mr. Mason's credibility.[10] Thus, at this point, the ALJ's credibility determination is not yet ripe for judicial review. Nonetheless on remand, to avoid arguments later, the Court encourages the ALJ to specifically address the evidence that Mr. Mason faults the ALJ for omitting from the original decision.[11]

---

[10] Depression may also provide the causal nexus between Mr. Mason's lack of daily activity and his underlying physical condition, which the ALJ previously found lacking. (R. 39 ("I do not doubt that the claimant does little on a daily basis. What I do doubt is the causal nexus between the claimant's extremely limited daily activities and the claimant's allegations that this results from his impairments.").)

[11] For example, Mr. Mason complains that the ALJ's opinion indicates that "the claimant did not complain of any medication side effects," (R. 39), when Mr. Mason actually testified that his medications "make [him] tired sometimes," (R. 404).

### 3.   The Description of Mr. Mason's RFC

Finally, Mr. Mason contends that the ALJ's assessment of his RFC was ambiguous and internally inconsistent because in one portion of the opinion the ALJ indicated that Mr. Mason could perform "light work" (R. 26), while later in the opinion the ALJ writes that the "claimant's ability to perform all or substantially all of the requirements of [light work] has been impeded by additional limitations," (R. 40).   The problem, according to Mr. Mason, is that the ALJ never specified what those other limitations might be.

From the ALJ's opinion (and from his questioning at the hearing (*see* R. 430-31)), it appears that the ALJ agreed with Dr. Hutson about the extent of Mr. Mason's limitations.   (*See* R. 37 ("Considering the claimant's vocational profile and residual functional capacity as outlined by Dr. Huston, the claimant is able to perform his past relevant work as a light unskilled hand packer….").)   Nonetheless on remand, when the ALJ re-assesses Mr. Mason's RFC to account for any depression that the ALJ finds that Mr. Mason suffers, the ALJ should specifically set forth Mr. Mason's limitations, rather than incorporating them by reference.   Such a practice is not only consistent with the "function-by-function assessment" and "narrative discussion" requirements for RFCs imposed under SSR 96-8p, but it also consistent with the need for ALJs to be clear in their opinions for judicial review.

### V.
### Conclusion

Despite the limited nature of the applicable standard of review, the Court finds that the ALJ erred, in part, in his treatment of Mr. Mason's applications for benefits.   Accordingly, the Court **VACATES** the decision denying benefits and **REMANDS** this matter back to the Commissioner for further proceedings pursuant to 42 U.S.C. § 405(g) (sentence four).   Final

judgment will be entered accordingly.

03/01/2010

Jane Magnus-Stinson
United States Magistrate Judge
Southern District of Indiana

**Distribution via ECF:**

Charles D. Hankey
charleshankey@hankeylawoffice.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov